

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 APR 16 PH 12:30
APR 1 6 2001
LORETTA G. WHYTE
     CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RICKIE L. BRUMFIELD** | **CIVIL ACTION** |
| **VERSUS** | **NO. 01-0300** |
| **N. BURL CAIN, WARDEN** | **SECTION "L" (6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b) (1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. For the reasons set forth below, it is recommended that the instant petition be **DENIED WITH PREJUDICE**.

## PROCEDURAL HISTORY

Petitioner, presently incarcerated in the Louisiana State Penitentiary located in Angola, Louisiana, was convicted in June, 1996, of first degree murder and later sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Following the affirmance of petitioner's conviction and sentence on appeal, petitioner sought post-conviction relief.

DATE OF MAILING _____

DATE OF ENTRY
APR 1 6 2001

'APR 1 6 2001

His efforts in this regard culminated with the Louisiana Supreme Court's denial of relief in **State ex rel. Brumfield v. State**, 778 So.2d 589 (La. 2001).

In the instant application for federal habeas corpus relief, petitioner sets forth the following claims: 1) Trial court erred in allowing into evidence a confession by petitioner which was not immediately preceded by a reading to petitioner of his <u>Miranda</u> rights; and, 2) petitioner received ineffective assistance of counsel due to counsel's concession of guilt during voir dire. The State has filed a timely response and does not contest the fact that the instant petition is timely and that petitioner has exhausted his state court remedies. See **Rose v. Lundy**, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982); **Dupuy v. Butler**, 837 F.2d 699, 702 (5th Cir. 1988).

**FACTS**[1]

In the early morning hours of January 20, 1995, in Washington Parish, Louisiana, petitioner shot the victim, Richard Spears, three times with a shotgun. Petitioner left the scene in the victim's car, but abandoned the car not far from the crime scene. Later that same morning after the victim's abandoned car was discovered, a sheriff's deputy searched for the victim at the victim's home and in his barn. The victim's body subsequently was found in the barn. The victim died as a result of the gunshot wounds.

During the course of their investigation, sheriff's deputies went to the nearby home of Bruce Brumfield, petitioner's father. Bruce was in the hospital but his sister, who had been

---

[1] The facts are adopted from the Louisiana Court of Appeal, First Circuit's opinion in **State v. Brumfield**, 96-KA-2749 (La. App. 1 Cir. 11/07/97) (unpublished opinion), after verification by this court that the facts are supported by the record. A copy of the Louisiana First Circuit's unpublished decision is contained in the State rec., vol. 10 of 10.

staying at the house, allowed the deputies to look around the yard. The deputies asked if there were any guns in the house and Bruce's sister showed them his guns. The deputies spotted a fresh piece of grass on one of the shotguns. Subsequently, the deputies found shotgun shells in the home similar to the shells found at the crime scene. The deputies had obtained consent to search Bruce's home.

On the morning of January 21, 1995, the petitioner was arrested. After being given his Miranda rights, petitioner signed a form wherein he waived his rights. In an interview with Washington Parish Sheriff's Deputies Michael and Harold Varnado, petitioner indicated he understood his rights. Petitioner admitted shooting the victim three times with a shotgun and shotgun shells taken from Bruce's house and taking the victim's car when leaving the scene. He admitted abandoning the car, running through a field to Bruce's house, and returning the gun to the gun rack. Petitioner denied taking the victim's wallet.

Later that same morning, Federal Bureau of Investigation Special Agent Joseph Edwards interviewed petitioner. Edwards also advised petitioner of his rights and petitioner signed a waiver of rights form. Petitioner told Edwards that at approximately 5:00 a.m. on January 20, 1995, he shot the victim in the victim's barn. Petitioner explained that he then took the victim's car, drove approximately one hundred yards down the road, and abandoned the car. Petitioner claimed he was angry with the victim because a few days earlier the victim had slapped and cursed the petitioner. Petitioner again denied that he had robbed the victim of his wallet.

On January 22, 1995, Washington Parish Sheriff's Deputy Colston Martin, who was a jailer where the petitioner was imprisoned, talked to petitioner at the jail and permitted petitioner to telephone his parents. Martin, who had known petitioner his entire life, asked petitioner about

the victim's wallet. Although petitioner initially denied that he had taken the wallet, he later admitted he took the victim's wallet and burned it behind his father's home. Prior to speaking with petitioner, Martin did not re-advise petitioner of his rights. According to Martin, the prison warden had suggested he ask petitioner about the wallet.

The following day, Michael Varnado interviewed petitioner. After re-advising petitioner of his <u>Miranda</u> rights, petitioner signed a waiver of rights form. At the beginning of the interview, Varnado explained petitioner's rights to him again and petitioner indicated he understood those rights. In this statement, petitioner admitted he took the victim's wallet after he shot the victim, and indicated that the wallet contained checks and $2.00 in cash. Petitioner then took the victim's car, but abandoned the car and returned to his father's home where he burned the wallet in a trash pile behind the house.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.[2]

---

[2] Section 2254(d) provides in full:
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." **Hill v. Johnson**, 210 F.3d 481, 485 (5th Cir. 2000). The United States Supreme Court has recently advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

**Williams v. Taylor**, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); **Hill**, 210 F.3d at 485. Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it `was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" **Hill**, 210 F.3d at 485, quoting 28 U.S.C.§ 2254(d)(2).

## ANALYSIS

Petitioner presents to this court the "mixed question" of whether or not his admission to Deputy Martin that he took the victim's wallet and later burned it behind his father's home, should have been suppressed because he was not re-advised of his Miranda rights prior to speaking to

---

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Martin. The Louisiana First Circuit Court of Appeal, the highest state court to address the merits of this issue, determined: "[E]ven assuming *arguendo* that the introduction of the complained of confession[] was erroneous because defendant was not re-advised of his Miranda rights, we find any error was harmless." **State v. Brumfield**, 96-KA-2749 (La. App. 1 Cir. 11/07/97) (unpublished opinion). As shown below, this determination on the part of the Louisiana First Circuit does not represent an unreasonable application of Supreme Court law.

In **Arizona v. Fulminante**, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (emphasis added), the Supreme Court made clear that the resolution as to whether or not the admission of an involuntary confession constitutes a constitutional violation is susceptible to a "harmless error" analysis, reasoning:

> The admission of an involuntary confession is a "trial error," similar in both degree and kind to the erroneous admission of other types of evidence. The evidentiary impact of an involuntary confession, and its effect upon the composition of the record, is indistinguishable from that of a confession obtained in violation of the Sixth Amendment--of evidence seized in violation of the Fourth Amendment--or of a prosecutor's improper comment on a defendant's silence at trial in violation of the Fifth Amendment. When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, **simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt**.

In accordance with the above mandate, the Louisiana Fourth Circuit examined what must be proven to support a first degree murder verdict such as the one rendered against petitioner:

> La. R.S. 14:30(A)(1) defines first degree murder, in pertinent part, as the killing of a human being "[w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration of ... aggravated burglary, armed robbery, ... first degree robbery, or simple robbery.

6

**State v. Brumfield**, 96-KA-2749, p. 6 n.1 (La. App. 1 Cir. 11/07/97). With the above definition in mind, the state appellate court noted that it was undisputed that petitioner, prior to the allegedly inadmissible confession regarding the stolen wallet, "admitted to Deputies Michael and Harold Varnado that he shot the victim and left the crime scene in the victim's car."[3] Thus, the Fourth Circuit reasoned: "[M]urdering the victim facilitated the robbery of the victim by the taking of his automobile." **Id.** (citation omitted). Accordingly, the court appropriately concluded that based upon the undisputed evidence, the elements of first-degree murder, as defined under LSA-R.S. 14:30(A)(1), had been satisfied, and any error in failing to suppress petitioner's later confession to stealing the victim's wallet was "clearly harmless." **Id.** at 7.

Petitioner presents a second "mixed question" to this court, alleging that he received ineffective assistance of counsel. See **Boyle v. Johnson**, 93 F.3d 180, 187 (5th Cir. 1996) (A claim of ineffective assistance of counsel is a mixed question of law and fact.). The applicable law concerning ineffectiveness of counsel was enunciated by the Supreme Court in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under **Strickland**, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong. **Strickland**, 466 U.S. at 697.

---

[3] See **Brumfield**, 96-KA-2749, p. 6. See discussion of FACTS supra at p. 3.

Under the deficient performance prong of the **Strickland** test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" **Lockhart v. Fretwell**, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), citing **Strickland**, 466 U.S. at 690, 104 S.Ct. at 2066). "An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." **U.S. v. Walker**, 68 F.3d 931, 934 (5th Cir. 1995), cert. denied, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), quoting **U.S. v. Acklen**, 47 F.3d 739, 742 (5th Cir. 1995). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. **Strickland**, 466 U.S. at 688-89, 104 S.Ct. 2065. Petitioner "carries the burden of proof...and must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of professional assistance." **Crockett v. McCotter**, 796 F.2d 787, 791 (5th Cir. 1986), cert. denied, 479 U.S. 1021, 107 S.Ct. 678, 93 L.Ed.2d 728 (1986).

To prove prejudice under the **Strickland** standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 466 U.S. at 694, 104 S.Ct. 2068. The **Strickland** court defined a reasonable probability as a "probability sufficient to undermine confidence in the outcome." **Id**. In making a determination as to whether prejudice occurred, courts must review the record to determine the "relative role that the alleged trial errors played in the total context of the trial." **Crockett**, 796 F.2d at 793.

Petitioner claims that counsel was ineffective due to his admission of petitioner's guilt during voir dire. A review of the pertinent transcript reflects the following colloquy by defense counsel during voir dire:

BY MR. SLOAN [Defense Counsel]:

> I want to tell you also something about this case which sets it apart from other cases, and I'm going to tell you right up front that Rickie Brumfield voluntarily confessed to killing Richard Spears, so the fact of the killing is not going to be disputed by us. So you won't have the choice, you won't be faced with the difficult choice of guilt or innocence or did he do it or somebody else do it. That choice won't be there, but the choice you will have is there are really three responsive verdicts you can give. One is first degree murder, which was discussed by the prosecutor, second degree murder and manslaughter. I want to talk about that.[4]

In support of his ineffectiveness claim, petitioner cites Wiley v. Sowders, 647 F.2d 642 (6th Cir. 1981), and Francis v. Spraggins, 720 F.2d 1190 (11th Cir. 1983), two cases in which the respective courts determined that admissions on the part of defense counsel as to their clients' guilt constituted ineffective assistance of counsel. However, in neither Wiley nor Francis did the prosecution's evidence include undisputed confessions by the respective defendants.[5]

---

[4] See State rec., vol. 6 of 10, transcript at pp. 1172-73. Counsel's strategy to avoid the death penalty and/or obtain a lesser included verdict of second degree murder or manslaughter is apparent from the record.

[5] In fact, in Francis, 720 F.2d at 1193, not only did the defendant not confess, he took the witness stand and categorically "denied any knowledge of participating in the crimes with which he was charged."

9

In the instant matter, petitioner, after being informed of his <u>Miranda</u> rights, twice confessed to shooting the victim, then taking his automobile.[6] The following reflects a taped statement taken from petitioner by Sheriff Deputies Harold Varnado, Jr. and Mike Varnado:

BY HAROLD VARNADO:
>This is Harold Varnado, Jr., Chief of Detectives, Washington Parish Sheriff's Office. Present with me is Deputy Investigator Mike Varnado, Washington Parish Sheriff's Office, and Rickie Ladell Brumfield, a 23 year-old black, male. The date is 1/21/95. The time is --

BY MIKE VARNADO:
>Fifteen minutes after 8:00.

BY HAROLD VARNADO:
>08:15 hours. We're going to have an interview with Mr. Brumfield and, Rickie, we want to question you about the incident in which Richard Spears was shot and killed. Before we ask you any questions, we want you to understand your rights.
>You have the right to remain silent or to answer questions. Anything you say can be used against you in court. You have the right talk to a lawyer for advice if you wish before you answer any questions, and you may have him with you during questioning. If you want a lawyer, but cannot afford one, a lawyer will be provided for you. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.
>The next part of this form is a consent to questioning form. It says: I have read the statement of my rights shown above. I understand what my rights are.
>Do you understand your rights?

BY RICKIE BRUMFIELD:
>Yes, sir.

BY HAROLD VARNADO:
>I'm willing to answer questions and make a statement.
>Are you willing to give me a statement at this time?

BY RICKIE BRUMFIELD:
>Yes, sir.

---

[6] <u>See</u> discussion of FACTS <u>supra</u> at p. 3.

10

BY HAROLD VARNADO:
    And answer any questions that I have to you?

BY RICKIE BRUMFIELD:
    Yes, sir.

BY HAROLD VARNADO:
    It says: I do not want a lawyer present. I understand and know what I am doing. Are you aware of what's going on?

BY RICKIE BRUMFIELD:
    Yeah.

BY HAROLD VARNADO:
    No promises or threats have been made to me and no pressure of any kind has been used against me.
    Do you understand each and every part of this statement?

BY RICKIE BRUMFIELD:
    I understand it.

BY MIKE VARNADO:
    Are you drunk or anything?

BY RICKIE BRUMFIELD:
    No, sir.

BY MIKE VARNADO:
    Are you high?

BY RICKIE BRUMFIELD:
    No, sir.

BY HAROLD VARNADO:
    Will you sign right here for me?

BY RICKIE BRUMFIELD:
    Yeah....

BY HAROLD VARNADO:
    Okay. I've read you this form?

BY RICKIE BRUMFIELD:
    You-all have explained it to me.

BY HAROLD VARNADO:
    You understand it?

BY RICKIE BRUMFIELD:
    Yes.

BY HAROLD VARNADO:
    I, you know, I want you to understand now this is being taped.

BY RICKIE BRUMFIELD:
    Yeah, I know it, I know it….

BY HAROLD VARNADO:
    All right. I want you to start at whatever point you choose and tell me what happened.

BY RICKIE BRUMFIELD:
    I'm fixing -- I'm fixing to tell you what, what happened. All right. I milked for him that Tuesday and he came and started, you know, who been going and messing around my daughter. And I told him, I don't, I don't know who is messing around with your daughter. He say, he say yeah you know, you know, you know, you know. See that baby, that baby girl, Fran she messing around with a black dude named Paul, stay out there like going to Tangipahoa. And he said yeah, yeah, you know. And I said, man, I don't know and so we was milking and he started up again saying man, you know, you know, you know. Then one word led to another and he slapped me in my face…. He slapped me like that. Slapped me in my face and (inaudible) and called me a nigger and all of that stuff and it just went to my head….

BY HAROLD VARNADO:
    All right. When was this now? What day was it?

BY RICKIE BRUMFIELD:
    Tuesday….

BY HAROLD VARNADO:
    Okay. And you didn't see him no more?

BY RICKIE BRUMFIELD:
    No. No more until....

BY HAROLD VARNADO:
    Let's go back to yesterday morning and Thursday night and yesterday morning.

BY RICKIE BRUMFIELD:
    All right.

BY HAROLD VARNADO:
    All right. Now, tell me about at the house. Who was at the house?

BY RICKIE BRUMFIELD:
    Oh, my, it wasn't nobody but me, me, Shawn and Penny and Penny's son and my baby sister and brother. That was it.

BY HAROLD VARNADO:
    What were you - all doing?

BY RICKIE BRUMFIELD:
    We was sitting there drinking.

BY HAROLD VARNADO:
    Drinking?

BY RICKIE BRUMFIELD:
    Yeah, beer....

BY HAROLD VARNADO:
    How much had you drank?

BY RICKIE BRUMFIELD:
    Oh, we had drunk about two cases....

BY HAROLD VARNADO:
    All right. What now? All right. You - all were sitting at the house drinking, everybody that you just mentioned. All right. Now, this is -- this is yesterday morning about 5:00 o'clock. Tell me what happened.

13

BY RICKIE BRUMFIELD:
> I got the gun off the rack, put three shells in it, walked over there and shot him.

BY HAROLD VARNADO:
> What kind of gun?

BY RICKIE BRUMFIELD:
> A .20 gauge. I don't know--I don't know the name of it. I just know it's a .20 gauge automatic.

BY HAROLD VARNADO:
> Did you load the gun?

BY RICKIE BRUMFIELD:
> Yes, sir, I loaded it.

BY HAROLD VARNADO:
> What color were the shells you put in it?

BY RICKIE BRUMFIELD:
> Yellow.

BY HAROLD VARNADO:
> Yellow. Do you know what kind they were, what shot they were?

BY RICKIE BRUMFIELD:
> No, sir. I ain't paid no attention to that.

BY HAROLD VARNADO:
> Where did you get them?

BY RICKIE BRUMFIELD:
> My daddy's room, my daddy's room. They got this basket and got the shells on the basket and [I] got three of them.

BY HAROLD VARNADO:
> You got three shells and you put them in the gun?

BY RICKIE BRUMFIELD:
> Yes, sir.

BY HAROLD VARNADO:
> All right.  When you left the house, how did you leave the house?...

BY RICKIE BRUMFIELD:
> I went out through the bathroom window....

BY HAROLD VARNADO:
> And then when you left there which way did you go?

BY RICKIE BRUMFIELD:
> Then I went, just fell down on the ground and went around just right down the black top....

BY HAROLD VARNADO:
> You walked up the blacktop?...

BY RICKIE BRUMFIELD:
> Yeah, I walked.  Yes, sir.  Yes, sir....

BY HAROLD VARNADO:
> When you got there to the barn, tell me what happened?

BY RICKIE BRUMFIELD:
> Oh, well, when I got to the barn I just shot because I was, I was just --

BY HAROLD VARNADO:
> Where was Mr. Richard at?

BY RICKIE BRUMFIELD:
> He was in the barn.  I was just -- it was just on my mind.

BY HAROLD VARNADO:
> On your mind about what he had done, called you a nigger and this and that and slapped you upside your head and accused you of some things?

BY RICKIE BRUMFIELD:
> Yes, sir.

15

BY HAROLD VARNADO:
    Okay. I understand that. All right. Now, when you got to the barn and you looked in the door --

BY RICKIE BRUMFIELD:
    Yes, sir.

BY HAROLD VARNADO:
    Did you go in the barn?

BY RICKIE BRUMFIELD:
    No, I never did. I never did go in the barn, I just stayed right there, right there by the -- right there in the front, right there where that little gate, where it goes across.

BY MIKE VARNADO:
    The door?

BY RICKIE BRUMFIELD:
    Yes, sir.

BY MIKE VARNADO:
    How many times did you shoot him?

BY RICKIE BRUMFIELD:
    Three. I guess three. I just --

BY HAROLD VARNADO:
    Where did you shoot him at?

BY RICKIE BRUMFIELD:
    I have no idea, sir....

BY HAROLD VARNADO:
    You just shot him?

BY RICKIE BRUMFIELD:
    Yes, sir, for all the stuff he hollered in my face. It was just built up in my head and all.

BY HAROLD VARNADO:
    Were you pretty drunk at the time, Rickie?

BY RICKIE BRUMFIELD:
    Yes, I was....

BY HAROLD VARNADO:
    All right. Now, after you shot him, how long did you stay there? Did you shoot him and leave?

BY RICKIE BRUMFIELD:
    Yeah. I cranked up the car.

BY HAROLD VARNADO:
    You got in the car that was there?

BY RICKIE BRUMFIELD:
    Yes, yes, sir. I got in the car and went down, went to the end. I started to keep going, but I just turned the car around and just killed it and just jumped out and ran, ran back to the house. When -- when, I was started I remember I passed the barn and then I went on down the field to go back to the house.[7]

    Corroborating the above evidence, FBI Special Agent Joseph Edwards testified:

EXAMINATION BY MR. MURRAY [Prosecutor]:
Q. Would you tell the jury what Mr. Brumfield told you about Mr. Spears' killing?

A. First he told me that he knew Mr. Spears, he had worked for Mr. Spears and known Mr. Spears well. There had been an altercation between himself and Mr. Spears which he said he claimed Mr. Spears struck him and cursed him.

Q. When you say "he" please say who you're referring to.

A. I'm sorry. Mr. Brumfield said Mr. Spears had struck him and cursed him. This began to eat at Mr. Brumfield and that altercation occurred on the Tuesday before Mr. Spears was murdered. Then on Thursday night and Friday morning Mr. Brumfield had been drinking with some other people and again, he said that this

---

[7] See State rec., vol. 8 of 10, transcript at pp. 1633-47.

17

altercation had been eating at him and he knew that Mr. Brumfield [sic] would be milking his cows about 5:00 in the morning.

He went and got a shotgun, a .20 gauge automatic shotgun, loaded it with some shells that were there at I believe it's his father's house. And he walked over to Mr. Spears' dairy area where he was milking the cows and without speaking he said he fired three rounds at Mr. Spears.

He denied robbing him, denied taking anything from Mr. Spears. He said he jumped in Mr. Spears' car and drove a short distance before the car had some kind of mechanical failure and then he ran back to the house from which he started and put the shotgun up where he got it from and placed some hats over the shotgun.[8]

In light of these unrefuted confessions, the reasoning behind defense counsel's voir dire statements concerning petitioner's guilt is clear. The fact that petitioner may disagree with defense counsel's jury-selection strategy does not render counsel's performance unconstitutionally ineffective. As Justice Harlan stated in his concurring opinion in Brookhart v. Janis, 384 U.S. 1, 8, 86 S.Ct. 1245, 1249, 16 L.Ed.2d 314 (1966): "A lawyer may properly make the tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval."

Further, assuming *arguendo* that defense counsel's challenged voir dire comments could be considered "objectively unreasonable," thereby satisfying Strickland's deficiency prong, petitioner has failed to make the requisite showing of prejudice. Given the uncontested evidence to the effect that petitioner shot and killed the victim, then fled the scene by taking the victim's automobile, petitioner has failed to show a reasonable probability that but for counsel's deficient performance during voir dire, the result of the proceeding would have been different. Accordingly;

---

[8] See State rec., vol. 7 of 10, transcript at pp. 1564-65.

18

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the instant habeas corpus petition filed by Rickie Brumfield pursuant to 28 U.S.C. § 2254, be **DENIED** with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. **Douglass v. United Services Automobile Association**, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 16th day of April, 2001.

LOUIS MOORE, JR.
United States Magistrate Judge